Nott, Ch. J.,
delivered the opinion of the court:
The statute relating to sea pay (Rev. Stat., 1571) is sweeping in its terms, but in neither departmental nor judicial construction has it been taken literally.
A ship at anchor is not a ship at sea; a ship sailing up a river is not a ship at sea; a ship in service on inland waters is not a ship at sea; a ship hauled up on a dry dock in a foreign *716 port is not a snip at sea; a ship fighting her way up the Mississippi in 1862 was not a ship at sea; yet in all of these cases it has been held by the accounting officers or the courts that officers serving on such vessels were entitled to sea pay-— that a ship at sea means nothing more than a ship afloat, she being at the same time so commissioned, authorized, and organized as to be able to render some kind or other of marine service.
As with the vessels, so with the officers, the statute has never been applied literally. The plain purpose of Congress is that the Government shall pay more where the officer renders more. Service on shipboard involves the breaking up of arrangements for living on shore; separation from family and friends; increased expenses and expenditures; increased hardships and duties, and many personal restrictions. The invariable questions which have been asked in doubtful cases have been, “Was the officer deprived of the ease and comfort and economies of shore duty?” “Did the service to which 'he was assigned require the sacrifice and discomforts and expenses of a life at sea ? ” If it did, he was entitled, within the legislative intent, to be considered on duty in a ship at sea; if it did not, he was entitled to no more than the pay of an officer on shore duty.
It is also as well settled as the Navy Regulations and the action of the accounting officers and the decisions of the court can make it that the sea pay of an officer does not stop every time he sets his foot upon the shore. (Collins's Case, 37 C. Cls. R., 222.) There is a difference between “shore duty” and duty on shore. It would be a monstrous perversion of the legislative purpose to say that the officers of a naval force landed to assault an eneni3r,s land batteries, or to protect a town, or to guard a consulate, or to bring off wood or water or provisions are in return for extra and hazardous service to be cut down in their pay. The regulations of a Department can not make the law or change it, but the head of a Department, by general regulations, can interpret the law for the benefit of his subordinates and give to it practical application. Accordingly, the Navy Regulations provide for the benefit of naval paymasters:
*717 “An officer temporarily absent from a ship in commission, to which he is attached, shall continue to receive sea pay.”
This states clearly a general principle. The difficulty in such cases probably will be to determine what is temporary absence and what is an assignment to shore duty.
In the present case the Secretary of the Navy has relieved the court from the duty of determining that question by the express terms of his order, which characterizes this officer’s added duty of inspecting steel tubes for boilers and his consequent absence from shipboard, as “ temporary,” and expressly refuses to relieve him from the duties and consequent responsibilities of his sea service. It is manifest that the chief engineer of a great ship of war like the Richmond has many duties and responsibilities besides appearing on the deck in uniform — such as making reports, ordering supplies, carrying on correspondence, preparing against accidents to his machinery, and supervising the work and discipline and accounts of his subordinates. The Richmond continued to lie at the League Island Naiy-Yard while the chief engineer went to Shelby, Ohio, to inspect boiler tubes; but he, and no other officer, continued to be her chief engineer as completety as if he walked her deck and slept in her cabin. His service in inspecting boiler tubes was, per se, shore duty; but his sendee on the Richmond at the same time was sea service, and the one was “temporary” and the other permanent.
In Symond's Case (21 C. Cls. R., 148) it was held that the Secretaiy of the Navy could not deprive an officer of his lawful pay by designating as shore duty that which was in fact sea service. Still less does it seem possible that a Secretaiy can attach an officer to a vessel at sea and compel him to discharge the duties of an important position, and burden him with its responsibilities, and then deprive him of his lawful pay by compelling him to perform additional duties on land. No person would s&y that this officer was not entitled to sea pay because he was doing work on land and that he was not entitled to shore-duty pay because he was attached to and doing duty upon a vessel at sea. Yet that would be the logical result of reasoning based upon a literal reading of the statute-
*718 It is true that in this case the officer’s absence while inspecting boiler tubes can be accurately ascertained, and in that particular the case differs from those of McGowan (36 C. Cls. R., 63) and Taussig (ante, p. 104); but the court can not assume, in the face of the Secretary’s order, that the officer was doing nothing else and had nothing else to do.
It must be held that when the Secretary of the Navjr characterizes a special service which he requires a.naval officer to perform and the officer’s consequent absence as “temporary,” the officer is entitled to the benefit of the characterization; and that when an officer duly attached to a ship at sea and entitled to sea pay has additional shore duty placed upon him by an order of the Secretary of the Navy, which in express terms declares that the shore duty is “in. addition” to the officer’s duties on his ship, the officer is not thereby deprived of his sea pay. A different conclusion would not only work the injustice of lessening the pay by increasing the duties, but would hamper and embarrass the Secretary of the Navy in the administration of his office.
The judgment of the court is that the claimant recover $133.70.